**GREATER BOSTON CHAMBER OF COMMERCE, Plaintiff,**

v.

**CITY OF BOSTON, Francis M. Roache as Commissioner of Police, and Raymond L. Flynn as Mayor of Boston, Defendants.**

Civ. A. No. 90–12503–T.

United States District Court, D. Massachusetts.

Nov. 14, 1991.

Patrick W. Hanifin, Stephen S. Ostrach, New England Legal Foundation, Boston, Mass., for plaintiff.

Joseph I. Mulligan, Albert W. Wallis, City of Boston Law Dept., Barry Wilson, Zalkind, Sheketoff, Wilson, Homan, Rodriguez & Lunt, Boston, Mass., William M. Kunstler, Ronald L. Kuby, New York City, for defendants.

## MEMORANDUM

TAURO, District Judge.

The Greater Boston Chamber of Commerce ("Chamber") sues the City of Boston, its Mayor, and its Commissioner of Police ("Commissioner"), seeking a declaration that a city ordinance entitled "In Memory of Robert Waterhouse" ("Ordinance") is unconstitutional. The City Council of Boston ("Council") has been permitted to intervene as a party defendant.[1]

The challenged Ordinance was enacted on July 25, 1990 by the Council, over a mayoral veto. It makes unlawful the hiring of "replacement workers"[2] during strikes or lock-outs, and forbids the recruitment or hiring of replacement workers when a threat to public safety is likely. Ordinance at § 3A–C. This threat is established either if police officers are deployed to the scene of a labor dispute, or if the Commissioner determines that a threat is likely. *Id.* at § 3D. Employers who violate the Ordinance are subject to fines. *Id.* at § 4.

The Chamber has moved for summary judgment, arguing that the Ordinance is unconstitutional, under the doctrine of federal labor law pre-emption enunciated in *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). The City and the Commissioner, though defendants, join the Chamber in its substantive posi-

---

1. *See Greater Boston Chamber of Commerce v. City of Boston,* 772 F.Supp. 696 (D.Mass.1991).

2. Although the Ordinance defines "strikebreaker" distinctly from "replacement worker," *see* Ordinance at § 2 E–G, this court is unaware of any substantive difference between the two words. *See Greater Boston Chamber of Commerce,* 772 F.Supp. at n. 1 (citing *NLRB v. Curtin–Matheson Scientific, Inc.,* 494 U.S. 775, 110 S.Ct. 1542, 1549 n. 6, 108 L.Ed.2d 801 (1990) (citation omitted)). The term "replacement worker" will, therefore, be used throughout this memorandum.

tion. The Council, as intervenor, presses the argument that the Ordinance is a valid exercise of the City's police power.

### A.

The Supreme Court has developed two pre-emption doctrines in the field of federal labor law. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110–11, 110 S.Ct. 444, 450–51, 107 L.Ed.2d 420 (1989) (*Golden State II*); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748–49, 105 S.Ct. 2380, 2393–94, 85 L.Ed.2d 728 (1985); *Belknap, Inc. v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983). The first applies to state laws that would affect conduct already controlled by the National Labor Relations Act ("NLRA") and, therefore, subject to the primary jurisdiction of the National Labor Relations Board ("NLRB"). *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244–45, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959). The second doctrine proscribes state intervention in labor relations that Congress intended to leave unregulated. *See Machinists*, 427 U.S. at 140, 96 S.Ct. at 2553.

The conduct that the Ordinance seeks to regulate—the hiring of replacement workers during a strike or lock-out— is a self-help remedy available to employers. *See NLRB v. MacKay Radio & Tel. Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938); *Belknap*, 463 U.S. at 500, 103 S.Ct. at 3177. Congress has not regulated this activity,[3] and employers may hire replacement workers, without thereby subjecting themselves to the NLRB's jurisdiction. Under *Machinists*, this court must determine whether effective implementation of the NLRA's purposes would be frustrated if the City were permitted to regulate the employment of replacement workers by enforcing its Ordinance. *See* 427 U.S. at 148, 96 S.Ct. at 2557.

As part of its statutory scheme, Congress intended that there be "a free zone from which all regulation, 'whether federal or State,'[4] ... is excluded." *Golden State II*, 493 U.S. at 111, 110 S.Ct. at 451, quoting *Machinists*, 427 U.S. at 153, 96 S.Ct. at 2559. In that way, Congress sought to accommodate the "free play of economic forces," *Machinists*, 427 U.S. at 147, 96 S.Ct. at 2556, and to guarantee employers and employees alike the right to the peaceful use of the economic weapons which they could muster. *See Golden State II*, 493 U.S. at 112, 110 S.Ct. at 452 ("[T]he interest in being free of governmental regulation of the 'peaceful methods of putting economic pressure upon one another,' *Machinists*, 427 U.S. at 154, 96 S.Ct. at 2560, is a right specifically conferred on employers and employees by the NLRA.").

Hiring replacement workers is recognized as a legitimate economic weapon of employers. *See, e.g., Golden State I*, 475 U.S. at 615, 106 S.Ct. at 1399, citing *Belknap*, 463 U.S. at 493, 500, 103 S.Ct. at 3174, 3177 (employer has power to hire replacements). It is, accordingly, " 'part and parcel of the process of collective bargaining.' " *Machinists*, 427 U.S. at 149, 96 S.Ct. at 2557, quoting *NLRB v. Insurance Agents*, 361 U.S. 477, 495, 80 S.Ct. 419, 430, 4 L.Ed.2d 454 (1960). The Ordinance, which curtails the employers' right to self-help by penalizing the use of this economic weapon, thwarts this process.

The City may not control the use of replacement workers, because to do so would directly interfere with the bargaining process intended by Congress.

### B.

Normally, the pre-emption analysis under *Machinists* would end with the conclusion that Congress intended to leave the subject conduct unregulated. The Court in

---

3. Pending legislation before Congress, however, would regulate such conduct. *See* S.Rep. No. 111, 102d Cong., 1st Sess. (1991); H.R.Rep. No. 57, 102d Cong., 1st Sess. (1991).

4. Municipalities are subject to this same limitation. *See Golden State Transit Corp. v. City of*

*Los Angeles,* 475 U.S. 608, 614 n. 5, 106 S.Ct. 1395, 1398 n. 5, 89 L.Ed.2d 616 (1986) (*Golden State I*) ("Our pre-emption analysis is not affected by the fact that we are reviewing a city's actions rather than those of a State.").

*Golden State I,* however, indicated that Congress may have contemplated that states would regulate an area of labor relations left unregulated by the NLRA. *See* 475 U.S. at 617, 106 S.Ct. at 1400.

The Supreme Court has permitted state regulation of conduct, otherwise unregulated by the NLRA, in two circumstances. In the first, the Court allowed Massachusetts to enforce a minimum-standards law in the collective bargaining context, concluding that Congress did not consider such laws inconsistent with the NLRA's goals. *Metropolitan Life Ins. Co.,* 471 U.S. at 754–58, 105 S.Ct. at 2396–99. In the second, the Court upheld a New York unemployment-compensation law against a pre-emption challenge, because the law did not regulate the labor-management bargaining relationship, but provided employment security throughout the state. *New York Tel. Co. v. New York State Dept. of Labor,* 440 U.S. 519, 532–33, 99 S.Ct. 1328, 1336–37, 59 L.Ed.2d 553 (1979) (plurality opinion).

Neither circumstance is present here. This Ordinance directly attempts to regulate the labor-management relationship. The Council fails to point to any evidence of a congressional intent to allow local regulation of replacement workers. Rather, the intent that may be discerned from analysis of the federal scheme is that the employment of replacement workers be left unregulated by local government. *See, e.g., Golden State II,* 493 U.S. at 112, 110 S.Ct. at 451–52; *Machinists,* 427 U.S. at 154, 96 S.Ct. at 2560; *Belknap,* 463 U.S. at 500, 103 S.Ct. at 3177.

### C.

■ The Council urges further that Congress did not intend to preempt laws touching interests "deeply rooted in local feeling and responsibility." *See Belknap,* 463 U.S. at 498, 103 S.Ct. at 3177. It contends that the Ordinance touches such interests. But, state laws of this nature, that have not been considered as pre-empted, were breach of contract actions, *id.,* trespass

actions, *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), and tort remedies for intentional infliction of emotional distress, *Farmer v. United Bhd. of Carpenters, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). Such cases are not apposite in analyzing the issue here, as they were decided under the *Garmon* doctrine of preemption. *See supra* p. 97. *Garmon* does not apply where, as here, the challenged Ordinance directly interferes with the bargaining process intended by the NLRA to be unregulated. Local interests, therefore, are immaterial. *See Brown v. Hotel & Restaurant Employees & Bartenders Int'l Union Local 54,* 468 U.S. 491, 503, 104 S.Ct. 3179, 3186, 82 L.Ed.2d 373 (1984) (citation omitted).[5]

### Conclusion

For the foregoing reasons, the Ordinance is pre-empted by federal labor laws. Insofar as it applies to firms engaged in interstate commerce, the Ordinance is unconstitutional and unenforceable.

---

5. This court's finding that the Ordinance affects conduct of central concern to federal labor law—the bargaining process—disposes of the Council's alternative argument, that the regulated conduct only peripherally concerns the NLRA. *See Golden State I,* 475 U.S. at 618 n. 8, 106 S.Ct. at 1400 n. 8.